IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

QSI INDUSTRIES, INC., *et al*,

                    Plaintiffs,                        CV-06-691-ST

        v.                              OPINION AND ORDER

ESU, LLC,

                    Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On July 24, 2008, plaintiffs, QSI Industries, Inc. ("QSI"), Frederick E. Severson

("Severson"), and Patrick A. Quinn ("Quinn"), filed a First Amended Complaint alleging that

defendant, ESU, LLC, violated 35 USC § 271 by contributorily infringing and inducing the

infringement of Patent No. 5,896,017 ('017 Patent) and Patent No. 5,448,142 ('142 Patent),

issued by the United States Patent and Trademark Office ("PTO") to Severson and Quinn on

April 20, 1999, and September 5, 1995, respectively.  Severson and Quinn have assigned

ownership rights in the patents to QSI.

///

The First Amended Complaint alleges that in late 2005 or early 2006, defendant began importing, offering for sale, and selling a product known as the "LokSound v.3.5 Decoder" ("Decoder") and other products intended to be installed in DC-powered model train units that, when installed and used, infringe QSI's patents.  Plaintiffs seek (1) a permanent injunction prohibiting defendant's infringement; (2) treble damages based on the intentional and willful nature of the infringement; and (3) attorney fees and costs.  Defendant denies that it has infringed either patent and asserts affirmative defenses and counterclaims that both patents are invalid.

The matter is before the court on defendant's Motion for Summary Judgment (docket # 98) as to patent Claims in the '017 Patent and the '142 Patent.

This court has federal jurisdiction under 28 USC §§ 1331 and 1338(a).  All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this action in accordance with FRCP 73 and 28 USC § 636(c) (docket # 37).

For the reasons that follow, the court **DENIES** defendant's Motion for Summary Judgment in its entirety.

## SUMMARY JUDGMENT

Plaintiffs allege that defendant's Decoder infringes Claims 1, 2, 5, and 6 of the '017 Patent and Claims 1, 2, 8, 10, and 15 of the '142 Patent.  Defendant asserts it is entitled to summary judgment that:  (1) the Decoder does not infringe independent Claim 1 of the '017 Patent and, therefore, as a matter of law, does not infringe dependent Claims 2, 5,  and 6 of the '017 Patent; (2) independent Claim 1 and dependent Claims 2, 5, and 6 of the '017 Patent are

invalid as obvious based on prior art; (3) the Decoder does not infringe Claim 15 of the '142

Patent; (4) Claims 1 and 10 and elements and limitations in Claims 2 and 8 of the '142 Patent are

invalid as obvious based on prior art; and  (5) all Claims in the '142 Patent are invalid based on

plaintiffs' inequitable conduct.

## **STANDARDS**   .

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any

material fact and the moving party is entitled to judgment as a matter of law.  The moving party

must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323

(1986).  Once the moving party shows the absence of an issue of material fact, the non-moving

party must go beyond the pleadings and designate specific facts showing a genuine issue for

trial.  *Id* at 324.  A "'scintilla of evidence,'" or evidence that is "'merely colorable' or not

'significantly probative,' does not present a genuine issue of material fact.  *United Steelworkers

of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989)

(citations omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000).  The court must view the

inferences drawn from the facts in the light most favorable to the non-moving party.  *Dethmers

Mfg. Co., Inc. v. Automatic Equip. Mfg., Co.*, 272 F3d 1365, 1369 (Fed Cir 2001), *cert denied*,

539 US 957 (2003); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F3d 1241, 1247 (Fed Cir),

*cert denied*, 531 US 993 (2000).

///

///

///

///

**UNDISPUTED FACTS**

The following facts are drawn from the relevant allegations in the parties' pleadings that are not controverted, and facts set forth in plaintiffs' Concise Statement of Disputed Material Facts that defendant does not specifically controvert.  Defendant has not submitted a separate Concise Statement of Material Facts in support of its motion.

QSI owns the '017 Patent, which is entitled "Model Train Locomotive with Doppler Shifting of Sound Effects, and the '142 Patent, which is entitled "Signaling Techniques for DC Track Powered Model Railroads."

Defendant imports and sells the alleged infringing Decoder.

The PTO issued Patent No. 4,914,431 ('431 Patent) to Severson in April 1990. Disclosures in the '431 Patent, including the existence of "command control," are also disclosed in the '017 Patent and '142 Patent.

Plaintiffs disclosed command control systems in general and Digital Command Control ("DCC") systems specifically in both the '431 and '142 Patents, and in Patent No. 5,773,939 ('939 Patent).

As of the date that QSI's '142 Patent was issued, the National Model Railroad Association had not adopted a standard for DCC.

**ANALYSIS**

The three overarching issues addressed in defendant's motion are:  (1) whether defendant's Decoder infringes Claims in the '017 Patent and '142 Patent; (2) whether certain

Claims in those patents are invalid because they are obvious based on prior art; and (3) whether the Claims in the '142 Patent are invalid based on plaintiffs' inequitable conduct before the PTO.

## I. __Infringement__

The first step in resolving a patent infringement claim is to construe the patent claim alleged to be infringed. *Markman v. Westview Instruments, Inc.,* 52 F3d 967, 979 (Fed Cir 1995) (*en banc)*, *aff'd,* 517 US 370 (1996). After the a patent claim has been construed by the court, the next step is to determine "whether the properly construed claim reads on the accused device." *Id.*

"[S]ummary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F3d 1298, 1304 (Fed Cir 1999).

The relevant construed terms are set forth in the parties' Amended Joint Claim Construction Statement (docket # 91) which includes claim constructions agreed on by the parties and other disputed terms construed by the court.

### A. __Independent Claim 1 of the '017 Patent__

Defendant contends there is no genuine issue of material fact that its Decoder does not infringe independent Claim 1 of the '017 Patent. Claim 1 specifies, *inter alia*:

> [a] model train locomotive . . . comprising: means for determining a present speed of the locomotive over the track . . . and means for shifting a pitch of the audible sound effects so as to simulate the Doppler effect as a substantially monotonic function of said speed of the locomotive."

Severson Decl., Ex. 4, Col. 42, lines 11-23 (emphasis added).

The issue is whether the Decoder infringes the two highlighted limitations.

///

### 1. __Means for determining a present speed of the locomotive over the track__

The court has construed this "means plus function" limitation to provide that the only means for determining present speed are the (1) back electromotive force ("BEMF") and (2) an optical tachometer or equivalents thereof. *See* Opinion and Order on Claim Construction, p. 24 (docket # 81). The term "present speed" is construed to mean the equivalent of the "speed right now" or "the speed now existing." *See* Joint Claim Construction Statement, p. 6.

Defendant contends that although its Decoder has a BEMF control as described in Claim 1 of the '017 Patent, it does not have the capability to determine the "present speed" of the train. Instead, the Decoder uses BEMF only for load control, that is, to keep the train at a constant speed set by the throttle whether going uphill or downhill. In other words, defendant's Decoder does not know how fast the train is going in terms of scale miles per hour. BEMF cannot be used to determine the actual speed of the train absent information about the type of motor and gear ratio in the locomotive. To demonstrate that proposition, defendant has submitted a video of two locomotives on side-by-side level tracks, which shows that when voltage is applied to both different locomotives using the same speed step settings on the Decoder, one locomotive travels down its track faster than the other locomotive. Lindner Decl., Ex. A. Since the Decoder lacks information to determine the speed for any particular model train, the two trains run at different speeds. In addition, when the train is manually stopped, the Doppler effect does not stop, but stays the same because it depends on the throttle setting,

not the actual speed of the train.  According to defendant, the "present speed" of each train must

be determined by the user watching the train and deciding how fast he or she wants it to go.

     Plaintiffs, however, contend that defendant's Decoder literally infringes Claim 1 of the

'017 Patent because defendant concedes it uses the same BEMF method described in Claim 1 to

determine if a locomotive is traveling at a selected speed.  Severson describes defendant's

system as follows:

> The structure used by defendant's [Decoder] to measure and determine the
> present speed of the model train is by measuring BEMF. . . .[T]he BEMF
> measurement determines the actual speed of the train, using the same
> technique disclosed in the '142 Patent in order to maintain that speed.

Severson Decl., ¶ 41.

     Plaintiffs also rely on deposition testimony of one of defendant's owners, Juergen

Lindner, who acknowledged that "when the motor [or speed]-control feature [of the Decoder] is

on,. . . the train will maintain a substantially constant speed based on measurements of back

EMF."  *Id*, Tab B, (Lindner Depo.), p. 22.  Finally, plaintiffs point out there is no limitation in

Claim 1 of the '017 Patent that an operator of plaintiff's system will know the actual speed of the

train while it is operating, *i.e.,* the scale miles per hour it is traveling.  Instead, it is only

necessary to know the relative speed of the train ("speed right now") for the Doppler shift to

vary as the speed varies.

### 2.  Means for shifting a pitch of the audible sound effects so as to simulate the Doppler effect as a substantially monotonic function of said speed of the locomotive

     This "means plus function" limitation in Claim 1 has been construed to provide a method

by which the operator is able to change the rate at which an output signal is sent to the train on

the track and to cause a change in frequency that is substantially proportional to the train's speed

on the track. *See* Opinion and Order on Claim Construction, p. 25.

Defendant contends that its Decoder changes the frequency of the sound effects as a

function of the locomotive's throttle setting and not as a function of the locomotive's present

speed. Defendant thus reiterates its contention that the actual speed of the locomotive is

unknown.

As set forth above, plaintiffs contend, and defendant does not deny, that BEMF, which is

an admitted feature of defendant's Decoder, controls the selected speed of the train. Likewise,

the shift in the frequency of the sound effects emitted by the train is proportional to how fast the

train is traveling.

### 3. Conclusion

Literal infringement of a properly construed claim is a question fact. *Wavetronix LLC v.*

*EIS Electronic Integrated Sys.,* 573 F3d 1343, 1358 (Fed Cir 2009). There is no genuine issue of

fact that both systems use the same means, *i.e.* BEMF, to determine the speed of the train on the

track, whether or not the operator knows the actual speed. The only dispute is one of semantics

centering on the definition of "present speed." If "present speed" refers to the relative speed of

the train, then defendant's use of BEMF to determine a commanded speed will infringe Claim 1.

However, if "present speed" refers to the actual speed of the train in terms of scale miles per

hour, then defendant's Decoder does not literally infringe Claim 1.

On this record, the court concludes that genuine issues of material fact exist as to whether

defendant's Decoder literally infringes the limitations described in Claim 1 of plaintiffs' '017

Patent. Thus, defendant is not entitled to summary judgment as to that patent claim.

As a result, plaintiffs' alternative argument that defendant's Decoder infringes Claim 1 of the of '017 Patent under the Doctrine of Equivalents is rendered moot for the purposes of the pending motions. This court need only address that issue if the jury finds that defendant has not literally infringed the '017 Patent.

### B. __Dependent Claims 2, 5, and 6 of the '017 Patent__

Based on the court's conclusion as to Claim 1 of the '017 Patent, defendant is not entitled to summary judgment of non-infringement as to Claims 2, 5, and 6 of the '017 Patent, which depend on Claim 1. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F2d 1546, 1552 n9 (Fed Cir 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on . . . that claim.").

### C. __Claim 15 of the '142 Patent__

Defendant contends there is no genuine issue of material fact that its Decoder does not infringe Claim 15 of the '142 Patent which describes:

> a method according to claim 10 further comprising changing the direction state in response to a polarity reversal of the DC track power signal.

Severson Decl., Ex. 5, Col. 47, lines 33-35.

Claim 10, in turn, of the '142 Patent provides:

> In a DC power model train locomotive having a motor, a method of using polarity reversals of the DC track power signal as a remote control signal . . .

*Id*, Col. 46, lines 56-59.

The court has construed these Claims to include the following limitation proposed by defendant that elaborates on the method described in Claim 15:

> All voltage to the track is removed, the polarity of the voltage is reversed
> in order to change the model train's direction state, and then the voltage is
> reapplied to the track.

Opinion and Order on Claim Construction, p. 23.

The infringement issue is whether there is any period of time during the polarity reversal process when no power is applied to the track. The specification for Claim 15 states "[w]e could also specify how long this period of time of no power must be before a [polarity reversal] signal is accepted . . . ." Severson Decl., Ex. 5, Col. 12, lines 30-31. The court construed this language to provide for "a period of time when the power to the track will be interrupted completely in order to effect the change in direction." Opinion and Order on Claim Construction, p. 23 (emphasis added).

In its motion, defendant argues that its Decoder does not infringe Claim 15 because a polarity reversal immediately changes the direction state. In response, plaintiff performed testing that showed, to the contrary, if a polarity reversal signal is sent by defendant's Decoder, the locomotive hesitates, then slows and reverses direction, and then gradually speeds up.

> When the polarity reversal is applied with the reverse switch on a DC
> power pack, the [Decoder] equipped E7 locomotive slowed down rapidly
> but not abruptly . . . then accelerates slowly to steady state in the opposite
> direction over about 25 seconds. . . . When a [polarity reversal] was
> applied to a [steam locomotive equipped with a Decoder, the locomotive]
> also decelerated slowly, stopped for a short period and then accelerated
> slowly in the other direction.

Severson Decl., ¶ 30.

At oral argument, defendant agreed with plaintiff's testing, but instead contended that the change in direction is accomplished without removing power from the track. In response to a polarity reversal signal, the locomotive is capable of immediately changing direction without stopping. However, the Decoder commands the locomotive to act more realistically when

changing direction by slowing down, stopping, and then accelerating in the opposite direction. In other words, the Decoder converts an immediate polarity reversal to a delayed change in direction through the controller while the track voltage remains constant.

In response to this new contention, plaintiffs countered that such a realistic change in direction in response to a polarity reversal is exactly what Claim 15 covers. Normally changing the polarity of the track voltage in order to change the direction of the train would cause a legacy DC model train to jerk to a stop or fly off the tracks. Using the special effect of Claim 15, the motor is no longer instantly responsive to the voltage on the track. Instead, the controller unit in the train does not apply all the power available on the track to the motor, but causes the train to slow to a stop and then smoothly accelerate in reverse.

Even if defendant's Decoder does not remove power to the track, it apparently interrupts the flow of power from the track to the motor for a period of time sufficient to accomplish the special effect of a controlled change in direction. Based on the existing record, this court is at a loss to determine with any certainty whether defendant's method of changing direction by interrupting power from the track to the motor infringes the limitation of Claim 15 requiring an interruption of power to the track. Thus, defendant has failed to carry its burden on summary judgment to prove the absence of a genuine issue of material fact as to any delay caused by its Decoder to reverse the direction of the train on the track.

## II.  Invalidity  - Obviousness/Prior Art

"A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims." 35 USC § 282. To overcome this presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing

evidence.  *Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 582 F3d 1288, 1295-96 (Fed Cir 2009) ("Each patent claim is presumed valid, and . . . the party contending that the asserted claims are invalid, . . . was required to prove invalidity of each claim by clear and convincing evidence.").

A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 USC § 103(a).  Whether the facts proved by the accused infringer establish that the claims of the patent are obvious is a question of law.  *Alza Corp. v. Mylan Labs., Inc.,* 464 F3d 1286, 1289 (Fed Cir 2006).

In making an obviousness determination, the Supreme Court instructs that courts are to conduct an inquiry into four factors:  (1) the level of ordinary skill in the pertinent art; (2) the scope and content of the prior art; (3) the differences between the prior art and the claims at issue; and (4) whether any secondary "objective indicia" of non-obviousness, such as commercial success, long felt but unsolved needs, failure of others, etc., shed light on the nature and origin of the claimed subject matter.  *KSR Int'l v. Teleflex, Inc.,* 550 US 398, 406 (2007), citing *Graham v. John Deere Co.,* 383 US 1, 17-18 (1966).

### A.  Claim 1 of the '017 Patent

Defendant contends that the part of Claim 1 of the '017 Patent that describes a "means for shifting a pitch of the audible sound effects so as to simulate the Doppler effect" is obvious based on prior art because it merely described existing elements known in the field of model trains to produce a predictable result.  Defendant asserts that when the PTO examiner reviewed the prior art during the prosecution of the '017 Patent, he erroneously operated on the belief that no previous train model had incorporated a simulated Doppler effect.  In fact, defendant

contends that a simulated Doppler effect for a steam whistle was disclosed in the Watanabe

Patent 4,325,355 ('355 Patent) issued in April 1992.

The Watanabe '355 Patent describes a "fan attached to the motor to create air pressure

which can then be used to blow a whistle." Lindner Decl., Ex. A, p. 47. The method for

blowing the whistle is described as follows:

> The air flow to the whistle builds up from near zero to a constant velocity
> governed by the sized of ingress hole. This causes the whistle to go from
> a very low pitch to a higher pitch as the closure member moves away from
> the ingress hole. The net result is a whistle as modified by a Doppler
> effect.

*Id.*

Severson responds that "[n]othing in the [Watanabe] patent teaches determining the

speed of a DC model train operating on tracks using BEMF. Nothing in the patent teaches one

to modify the pitch of sound effects by electronically altering the sound effects to produce a shift

in the pitch that is proportionate to the speed." Severson Decl., ¶ 47. Accordingly, he opines

that the Watanabe '355 Patent "is not pertinent prior art." *Id.*

On this record, the court agrees with plaintiffs that defendant has failed to establish

genuine issues of material fact as to whether Claim 1 of the '017 Patent relating to a "means for

shifting a pitch of the audible sound effects so as to simulate the Doppler effect" is invalid as

obvious based on prior art. Without further evidence, it appears to the court that, at a minimum,

an issue of fact exists as to whether the Watanabe '355 Patent describes a substantially different

means and function than is described in Claim 1 of the '017 Patent.

///

///

### B.  Claim 1 of the '142 Patent

Claim 1 of the '142 Patent provides for:

> A model train locomotive for use on a model railroad track that is coupled to a power supply for controllably applying a polarity-reversal DC track power signal to the track . . . .

Severson Decl., Ex. 5, Col. 45, lines 55-59.

Defendant contends this Claim recites a combination of legacy DC model train operations (speed controlled by voltage) and DCC signaling techniques (using polarity reversals) applied on top of the legacy DC signal. According to defendant, legacy DC and DCC signaling techniques were well known before the creation of the '142 patent invention, as was the use of a bridge rectifier to insulate the motor from the track. In support, defendant cites Severson's testimony at the Markman Hearing in September 2008, in which he acknowledged that DCC "had primarily been invented . . . during the '80s." Knight Decl., Ex. 3, pp. 2-3. Defendant contends that Claim 1 of the '142 Patent is invalid as obvious because plaintiffs merely combined two known concepts, DCC signaling techniques with DC to create a predictable result, *i.e.,* a polarity reversal that was obvious based on prior art. As stated by the Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415-416 (2007), citing *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.,* 340 US 147, 152 (1950):

> a patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men. This is a principal reason for declining to allow patents for what is obvious. *The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results*.

(emphasis added).

Plaintiffs respond that defendant offers no analysis of the prior art and no showing that a reasonably skilled person in the art would have foreseen that the approach taken by plaintiffs would work. As Severson explains:

> First, we did not believe DCC systems or the type of signal they use was relevant or material prior art at the time of the '142 application, except insofar as it indicated the direction the industry was going, and our desire to try to develop a control system in an entirely different platform, the Legacy DC mode.
>
> I also disagree that the '142 invention is simply a combination of known elements. In fact, if you simply combine a DCC controller and a Legacy DC train as defendant's counsel suggests you could, you would not infringe the '142 patent. For one thing, you would not have a variable power control. If a standard DCC signal is sent to a Legacy DC model train, the model train will not operate properly. It will, at a minimum, hum and overheat. It may be seriously damaged. . . . Simply combining the two technologies was not an alternative then or now.

Severson Decl., ¶¶ 23-24.

On this sparse record, the court agrees with plaintiffs that at a minimum, genuine issues of material fact exist as to whether plaintiffs merely combined two known concepts, DCC signaling techniques with DC, to create a predictable result that would render Claim 1 of the '142 Patent invalid.

### C. **Elements and Limitations in Claims 2 and 8 of the '142 Patent**

Claim 2 adds to Claim 1 "an on-board electronic state generator for indicating a present state" as "the means for controlling remote effects." *Id*, Ex. 5, Col. 46, lines 1-2. Claim 8 adds to Claim 1 "a motor reverse unit for driving the motor according to a selectable direction state." *Id*, Ex. 5, Col 46, lines 43-44.

The PTO determined that Claims 2 and 8 were not independently patentable over Claim 1 of the '142 patent.  Accordingly, defendant contends Claims 2 and 8 are invalid if Claim 1 of the'142 Patent is invalid.

The existence of a genuine issue of material fact as to the validity of Claim 1 of the '142 Patent also precludes summary judgment as to Claims 2 and 8 of the '142 Patents since they depend on Claim 1.  *Wahpeton,* 870 F.2d at 1552 n9.

**D.  Claim 10 of the '142 Patent**

Claim 10 describes five steps that comprise "a method of using polarity reversals of the DC track power signal as a remote control signal."  Severson Decl., Ex. 5, Col. 46, lines 56-58.  Defendant contends that Claim 10 is invalid because its incorporates the same combination of DCC signaling techniques and DC track power signal described in Claim 1 of the '142 patent that is invalid as obvious based on prior art.  Because Claim 1 describes the device and Claim 10 describe the method, these claims are, in essence, alter egos.  For the same reasons stated as to Claim 1 of the '142 Patent, genuine issues of material fact preclude summary judgment in defendant's favor as to this issue.

**III.  Invalidity - Inequitable Conduct**

"Applicants for patents are required to prosecute patent applications in the [Patent Trademark Office] with candor, good faith, and honesty."  *Molins PLC v. Textron, Inc.,* 48 F3d 1172, 1178 (Fed Cir 1995).  A breach of this duty  constitutes "inequitable conduct," which can arise from an "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive" or mislead the PTO.  *Id*.

"Material information" is that which a "reasonable examiner would consider [] important to consideration of the patent application." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F3d 1359, 1364 (Fed Cir 2007). "Intent to deceive . . . must be proved by clear and convincing evidence." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F2d 867, 872 (Fed Cir 1988). Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Molins*, 48 F3d at 1178.

Defendant asserts that plaintiffs' failure to disclose the prior art relating to DCC technology (in particular, polarity reversals) to the PTO amounts to inequitable conduct. In response, plaintiffs point to the following disclosure of DCC technology to the PTO in their Patent No. 4,914,431 ('431 Patent), issued in April 1990:

> Over the last ten to fifteen years, a number of electronic control systems have been developed that attempt to solve one or both of the problems of independent train control and expanded remote control ability. One approach is called command control and uses transmitter/receiver techniques to address single engines at a time. . . . Some of these systems also have remote control options where an operator can turn on a bell or light on his engine independent of other operators. Most of these command control systems have a means of controlling slaving engines together so that multiple unit[s] . . . can be made up.

Severson Decl., Ex. 3 ('431 Patent), Col. 2, lines 16-38.

Plaintiffs also note that the patent examiner for the '142 Patent cited the '431 patent as a reference. Severson Decl., Ex. 5, p. 1. Severson also asserts that "we did not believe DCC systems or the type of signal they use was relevant or material prior art at the time of the '142 application, except insofar as it indicated the direction the industry was going, and our desire to try to develop a control system in an entirely different platform, the Legacy DC mode." *Id,* ¶ 23. In other words, plaintiff claims that it moved away from the trend towards the DCC standard and

tried to figure out how to use polarity reversals to signal multiple remote control effects in a legacy DC model train without any certainty that it could be done, especially at low voltages.

On this record, the court concludes that genuine issues of material fact exist as to whether plaintiffs engaged in inequitable conduct before the PTO in the manner in which they disclosed or failed to disclose the existence of DCC technology as prior art when they applied for the '142 Patent.

## **ORDER**

For all the reasons set forth above, defendant's Motion for Summary Judgment (docket # 98) is DENIED in its entirety.

DATED this 5th day November, 2009.

 s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge